# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FRIENDS OF ANIMALS,<br>777 Post Road Suite 205<br>Darien, CT 06820<br><br>   Plaintiff,<br><br>vs.<br><br>THE UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States<br>1849 C Street N.W.<br>Washington, D.C. 20240<br><br>   Defendant. | Civ. Case No.<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.  Plaintiff, Friends of Animals, files this action on its own behalf and on behalf of its adversely affected members against the United States Bureau of Land Management (BLM) to challenge the December 9, 2016 Roundup Decision to round up 600-700 wild horses, remove 200-300 wild horses, and administer the fertility control drug Porcine Zona Pellucida (PZP) to approximately 200 wild horses in the Cedar Mountain Herd Management Area, DOI-BLM-UT-WT010-2016-0016-DNA (hereinafter, "2016 Roundup Decision").

2.  In reaching the 2016 Roundup Decision, BLM failed to fulfill its obligations under the National Environmental Policy Act (NEPA) to evaluate the impacts and alternatives to the proposed actions.

3.  The 2016 Roundup Decision is a major federal action that has the potential to significantly impact the human environment.

4.  In reaching the 2016 Roundup Decision, BLM failed to conduct any project specific environmental analysis under NEPA. BLM prepared neither an environmental assessment (EA) nor an environmental impact statement (EIS) for the decision.

5.  BLM purports to have fulfilled their NEPA duties through the use of documents that are five years old and older: (1) the Cedar Mountain and Onaqui Mountain Wild Horse Herd Management Areas Capture, Treat and Release Plan Fertility Control with Limited Removal Environmental Assessment – UT-W010-2011-0031-EA, January 2012 (hereinafter, "2012 Decision"); (2) the Removal of Excess Wild Horses from the Cedar Mountain Herd Management Area Environmental Assessment – UT-020-2008-020, October 2008 (hereinafter, "2008 Decision"); and (3) the Wild Horse Appropriate Management Level and Herd Management Area/Herd Boundary Environmental Assessment UT-020-2002-100, February 2003 (hereinafter, "2003 Decision").

6. All of the actions analyzed in the previous decision have been completed, and none of the previous decisions contemplated the 2016 Roundup Decision. In fact, the 2012 Decision specifically stated, "Future actions would be subject to evaluation through the appropriate level of NEPA documentation."

7. BLM's own manuals also require site-specific NEPA analysis for each roundup, as has occurred in the past.

8. BLM's reliance on the older decisions and EAs for the 2016 Roundup Decision is especially misplaced because the scope of the 2016 Roundup Decision is larger than any of the previous actions.

9. Additionally, the previous decisions and EAs do not adequately address the physical, behavioral and social impacts of PZP on wild horses.

10. Neither the 2003, 2008, or 2012 Decisions, which contemplated a different action at different times, can be said to have placed the public and interested organizations (like Friends of Animals) on reasonable notice that more than five years later, the Cedar Mountain Wild horses would be subject to an even larger roundup and additional doses of PZP.

11. For these reasons, as further alleged below, Friends of Animals seeks a declaration from the Court that BLM violated NEPA and the Wild Free-Roaming Horses and Burros Act (WHBA). Friends of Animals further requests that the Court vacate and remand the December 9, 2016 Roundup Decision, and enjoin the removal of wild horses from the Cedar Mountain HMA.

**PARTIES**

12. Friends of Animals is a nonprofit, international animal advocacy organization, incorporated in the state of New York since 1957. Friends of Animals works to cultivate a respectful view of nonhuman animals, free-living and domestic. Friends of Animals' goal is to free animals from cruelty and institutionalized exploitation around the

world. Friends of Animals informs it members about animal advocacy issues and its progress in addressing them through its magazine, *ActionLine*, its website, and other public reports. Friends of Animals is a leading organization advocating for the preservation of wild horses on public lands. Friends of Animals has published articles on wild horses. Members of Friends of Animals regularly visit the Cedar Mountain HMA to view, appreciate, study, and photograph the wild horses there. Friends of Animals has also organized several events to educate the public about wild horses, the cruel impacts of the roundups, and the outdated, inaccurate scientific bases used to justify roundups.

13. Friends of Animals and its members have significant personal and professional interests in the wild horses in and around the Cedar Mountain HMA.

14. Defendant Bureau of Land Management is an agency within the Department of Interior. The Cedar Mountain HMA is located on BLM administered public land, and the agency is responsible for ensuring that federally-administered actions within the HMA comply with the requirements of all federal laws, including NEPA and the WHBA.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This action presents a case and controversy arising under the Administrative Procedure Act (APA), NEPA and the WHBA. This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant. The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. § 2202 (injunctive relief).

16. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e). Defendant BLM resides in this district.

## LEGAL BACKGROUND

**A.   National Environmental Policy Act.**

17. NEPA is our nation's basic charter for environmental protection.

4

18. Congress enacted NEPA for two central purposes. First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting. Second, Congress sought to provide the public with a statutory means to be informed about, and to comment on, the environmental impacts of proposed agency actions.

19. NEPA requires federal agencies to analyze the environmental impacts of a particular federal action before proceeding with that action. *See* 42 U.S.C. § 4332(2)(C).

20. Accordingly, before a federal agency can act in a way that significantly affects the quality of the human environment, NEPA requires the acting agency to prepare a detailed environmental impact statement (EIS) that discusses, among other things: "(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action." 42 U.S.C. § 4332(2)(C).

21. The EIS is the cornerstone of NEPA. An EIS is required for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The requirement to prepare an EIS is broad and intended to compel agencies to take seriously the potential environmental consequences of a proposed action.

32. Whether an agency action is "significant" enough to require preparation of an EIS involves "considerations of both context and intensity." 40 C.F.R. § 1508.27. The context of the action includes factors such as "society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a). Intensity "refers to the severity of the impact" and requires BLM to consider several factors including: impacts of the action, unique characteristics of the geographic area, the degree to which environmental effects of the proposed action are highly controversial; the degree to which the action may have a precedential effect; the degree to which possible effects of the action are highly uncertain or involve unique or unknown risks; whether the action is related to other actions with individually insignificant but cumulatively significant impacts; and the

degree to which the action may have an adverse effect on threatened species or their critical habitat. 40 C.F.R. §1508.27(b).

33. Agencies may prepare an Environmental Assessment (EA) to determine whether a proposed action requires preparation of an EIS or warrants a finding of no significant impact.

34. An EA must take a "hard look" at the potential consequences of an agency's proposed actions and provide enough evidence and analysis for determining whether to prepare an EIS. Agencies must involve the public, to the extent practicable, in preparing this assessment. 40 C.F.R. § 1501.4 (b).

35. If the agency decides the impacts are not significant, it must supply a convincing statement of reasons why, and make its finding of no significant impact available to the public. 40 C.F.R. § 1501.4 (e).

36. A significant effect may exist even if the federal agency believes that on balance the effect will be beneficial. 40 C.F.R. §1508.27(b)(1).

37. Whether in an EA or EIS, an agency must adequately evaluate all potential environmental impacts of the proposed action. *See* 42 U.S.C. § 4332(2)(C). To meet this obligation, the federal agency must identify and disclose to the public all foreseeable impacts of the proposed action, including direct, indirect, and cumulative impacts. *See id.* § 4332(2); *see also* 40 C.F.R. §§ 1508.7-1508.8

38. After preparing an EA or EIS, an agency may not simply rest on the original document. The agency must gather and evaluate new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of its future planned actions.

39. NEPA requires an agency to prepare a supplemental NEPA analysis when "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or . . . [t]here are significant new circumstances or information

relevant to environmental concerns and bearing on the proposed actions or its impacts." 40 C.F.R. § 1502.9(c)(1).

40. BLM's directives require a site-specific NEPA analysis before removing wild horses from public lands.

41. The Department of the Interior's manual also specifies that a Determination of NEPA Adequacy (DNA) does not itself provide a NEPA analysis.

**B.     Wild Free-Roaming Horses and Burros Act.**

42. In 1971 Congress passed the WHBA, 16 U.S.C. §§ 1331 *et seq*., finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene."

43. Upon finding this, Congress stated its policy was that "wild free-roaming horses and burros shall be protected from capture, branding, harassment, or death, and to accomplish this they are to be considered in the area where presently found as an integral part of the natural system of public lands." 16 U.S.C. § 1331.

44. The WHBA requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

45. The WHBA requires that wild horse ranges be devoted principally for wild horses, and requires any management of wild horses and burros to be at "the minimal feasible level." 16 U.S.C. §§ 1332(c), 1333(a).

46. In limited circumstances, the WHBA allows the removal of wild horses. However, prior to gathering or removing any wild horses from the range, the WHBA requires BLM to make a determination that: (1) "an overpopulation [of wild horses] exists

on a given area of the public lands," and (2) "action is necessary to remove excess animals." 16 U.S.C. § 1333(b)(2).

47. The WHBA defines the term "excess" as animals that "must be removed from an area in order to preserve and maintain a thriving ecological balance and multiple-use relationship in that area." 16 U.S.C. § 1332(f).

48. The WHBA mandates that BLM's decisions regarding the management of wild horses "shall consider the recommendations of qualified scientists in the field of biology and ecology, some of whom shall be independent of both Federal and State agencies. . .." 16 U.S.C. § 1333.

49. In particular, the WHBA mandates that when BLM is making a determination about whether an overpopulation exists and action should be taken to remove excess animals it should consult with various individuals. For example, BLM should consult with individuals independent of Federal and State government that have scientific expertise and special knowledge of wild horse and burro protection, wildlife management and animal husbandry as related to rangeland management. 16 U.S.C. § 1333.

50. BLM's Wild Horses and Burros Management Handbook explains that: "Before issuing a decision to gather and remove animals, the authorized officer shall first determine whether excess [wild horses] are present and require immediate removal. In making this determination, the authorized officer shall analyze grazing utilization and distribution, trend in range ecological condition, actual use, climate (weather) data, current population inventory, wild horses and burros located outside the [herd management area] in areas not designated for their long-term maintenance and other factors such as the results of land health assessments which demonstrate removal is needed to restore or maintain the range in a [thriving, natural ecological balance]."

**FACTUAL BACKGROUND**

A.  **The 2003 Decision and Record.**

51.  The Cedar Mountain HMA compromises approximately 197,252 acres, located 50 miles west from Salt Lake City, Utah.

52.  Wild horses were present in this area in 1971 when Congress passed the WHBA.

53.  In 2003, the BLM modified the Appropriate Management Level (AML) for the Cedar Mountain and Onaqui Mountain Herds.

54.  The 2003 Decision and EA did not analyze the impact of rounding up or removing wild horses.

55.  The AML established in the 2003 Decision was based on the number of horses the area would support under drought conditions as measured in 2003.

56.  The 2003 Decision and EA were also based on an annual reproduction success rate of approximately 20%.

57.  In the 2003 Decision and EA, BLM committed to conduct site-specific analysis NEPA analysis for future actions, specific to such action.

58.  The 2003 Decision and EA did not discuss, analyze, or even contemplate the administration of PZP to wild horses in the Cedar Mountain HMA.

B.  **The 2008 Decision and Record.**

59.  In 2008, BLM conducted an EA to analyze the impact of rounding up 573 wild horses and removing 447 wild horses in the Cedar Mountain HMA.

60.  The 2008 Decision and EA also considered a one-time administration of PZP as research, and committed to monitoring the results.

61.  Prior to the 2008 Decision, BLM conducted grazing utilization studies and released information in an EA analyzing whether there were excess wild horses and removal was necessary.

62. Prior to the 2008 Decision, BLM determined that there were excess wild horses that needed to be removed.

63. Prior to the 2008 Decision, BLM considered and analyzed the impacts and alternatives to its proposed action.

64. The 2008 Decision was implemented and completed.

65. The 2008 Decision did not analyze the impact of any future roundups or removals.

66. The 2008 Decision did not analyze the impact of future applications of PZP to wild horses in the Cedar Mountain HMA.

### C.   The 2012 Decision and Record.

67. In 2011, BLM issued another EA for proposed roundup of approximately 326 wild horses, the removal of 65 wild horses and the administration of PZP to a limited number of mares in the Cedar Mountain HMA.

68. Prior to the 2012 Decision, BLM released an EA that analyzed whether there was excess wild horses and removal was necessary.

69. Prior to the 2012 Decision, BLM determined that there were excess wild horses that needed to be removed.

70. Prior to the 2012 Decision, BLM considered and analyzed the impacts and alternatives to its proposed action.

71. The 2012 Decision was implemented and completed.

72. The 2012 Decision did not analyze the impact of any future roundups or removals.

73. The 2012 Decision did not analyze the impact of future applications of PZP to wild horses in the Cedar Mountain HMA.

74. The 2012 Decision and EA did not not include any references to PZP research more recent than 2010.

75.     In the 2012 Decision, BLM committed to conduct future monitoring through flight inventories and on the ground monitoring to determine foaling rates and how effective the fertility control treatment was towards overall population suppression.

76.     In the 2012 Decision, BLM stated that "[f]uture actions would be subject to evaluation through the appropriate level of NEPA documentation."

**D.    The 2016 Roundup Decision and Record.**

77.     On December 9, 2016, over four years after the 2012 Decision, BLM issued a Decision Record approving the roundup of 600-700 wild horses from the Cedar Mountain HMA, the removal of 200-300 wild horses, and the administration of PZP to approximately 200 mares.

78.     Unlike prior roundup decisions, BLM did not conduct an EA prior to the 2016 Roundup Decision.

79.     Unlike prior roundup decisions, BLM did not evaluate or analyze whether there were excess wild horses and removal was necessary prior to issuing the 2016 Roundup Decision.

80.     Unlike prior roundup decisions, BLM did not make a proper determination that there were excess horses that needed to be removed prior to the 2016 Roundup Decision.

81.     Unlike prior roundup decisions, BLM did not provide a NEPA analysis of the impact of its proposed actions in the 2016 Roundup Decision.

82.     Unlike prior roundup decisions, BLM did not consider or analyze alternatives to it proposed actions in the 2016 Roundup Decision.

83.     BLM did not publicly disclose or analyze previous flight and ground monitoring to determine foaling rates, as it committed to do, prior to the 2016 Roundup Decision.

84. BLM issued a Determination of NEPA Adequacy (DNA) for the proposed roundup and administration of PZP to occur in 2017. The DNA relies upon the 2003, 2008, and 2012 EAs for compliance with NEPA.

85. Neither the 2003, 2008, nor the 2012 EAs discuss the actions proposed in the 2016 Roundup Decision.

86. There were several concerns relevant to the 2016 Roundup Decision that were not addressed by previous EAs.

87. None of the previous EAs discussed recent information and studies regarding the impacts of PZP.

88. The previous EAs failed to address information regarding the potential impact of repeated application of PZP on wild mares.

89. The previous EAs failed to address information regarding the impact of PZP causing mares to foal out of season.

90. The previous EAs failed to address the cost and impacts of the 2016 Roundup Decision.

91. In the 2016 Roundup Decision, BLM failed to consider the impact of the administration of PZP on unborn foals.

92. BLM did not make a proper determination that the foals impacted by PZP were excess horses that needed to be removed prior to the 2016 Roundup Decision.

## FIRST CAUSE OF ACTION
### (VIOLATIONS OF NATIONAL ENVIRONMENTAL POLICY ACT: FAILURE TO CONDUCT AN EA OR EIS FOR THE 2016 ROUNDUP DECISION)

93. Friends of Animals alleges and incorporates by reference all of the preceding paragraphs.

94. The 2016 Roundup Decision to round up 600-700 wild horses, remove 200-300 wild horses and administer PZP to approximately 200 wild horses in the Cedar Mountain HMA is a major federal action subject to NEPA.

95. Before issuing the 2016 Roundup Decision, BLM did not prepare an EA or an EIS, or FONSI.

96. The 2003, 2008, and 2012 Decisions and EAs do not cover the proposed roundup of 600-700 wild horses, removal of 200-300 wild horses, and administration of PZP to approximately 200 wild horses in the Cedar Mountain HMA.

97. The 2003, 2008, and 2012 Decisions and EAs do not consider or analyze new information about the impacts of BLM's proposed actions.

98. Even assuming BLM could rely on the outdated EAs as a basis for complying with NEPA with regard to the actions in the 2016 Roundup Decision, the old EAs failed to consider alternatives to meet the purpose and need of the proposed 2016 roundup.

99. Even assuming BLM could rely on the outdated EAs as a basis for complying with NEPA with regard to the actions in the 2016 Roundup Decision, BLM failed to supplement or update older EAs to account for significant new information.

100. In issuing the 2016 Roundup Decision without complying with NEPA, BLM's actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, in violation of the APA, 5 U.S.C. § 706(2).

101. Absent injunctive and declaratory relief against Defendant, Friends of Animals will suffer irreparable harm.

**SECOND CAUSE OF ACTION**
**(VIOLATIONS OF WILD FREE-ROAMING HORSES AND BURROS ACT: FAILURE TO MAKE A PROPER EXCESS DETERMINATION)**

102. Friends of Animals alleges and incorporates by reference all of the preceding paragraphs.

103. On the above facts and legal obligations, BLM violated the WHBA by failing to make an appropriate determination that wild horses were excess prior to authorizing their permanent removal from the Cedar Mountain HMA.

104. On the above facts and legal obligations, BLM violated the WHBA by failing to make an appropriate determination that wild horses and their foals were excess prior to authorizing the administration of PZP to such horses.

105. In issuing the 2016 Roundup Decision without complying with the WHBA, BLM's actions are arbitrary and capricious, an abuse of discretion, and not in accordance with law or required procedure, in violation of the APA, 5 U.S.C. § 706(2).

106. Absent injunctive and declaratory relief against Defendant, Friends of Animals will suffer irreparable harm.

//

//

//

**REQUEST FOR RELIEF**

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

A. Declare that Defendant's December 9, 2016 Cedar Mountain Herd Management Area Decision and Determination of NEPA Adequacy, DOI-BLM-UT-WT010-2016-0016-DNA, violated the National Environmental Policy Act and the Administrative Procedure Act;

B. Declare that Defendant's December 9, 2016 Cedar Mountain Herd Management Area Decision and Determination of NEPA Adequacy violated the Wild Free-Roaming Horses and Burros Act and the Administrative Procedure Act;

C. Enjoin any action previously authorized by Defendant's December 9, 2016 Cedar Mountain Herd Management Area Decision and Determination of NEPA Adequacy, unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

D. Vacate and remand back to BLM the December 9, 2016 Cedar Mountain Herd Management Area Decision and Determination of NEPA Adequacy;

E. Award Friends of Animals reasonable costs, litigation expenses, and attorneys' fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and/or all other applicable authorities; and/or

F. Grant such further relief as the Court deems just and equitable.

Dated: January 20, 2017

Respectfully submitted,
s/ Michael Harris
Michael Ray Harris (DC Bar #CO0049)
Friends of Animals, Western Region Office
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO 80112
720-949-7791
michaelharris@friendsofanimals.org

s/ Jennifer Best
Jennifer Best (DC Bar # CO0056)
Assistant Legal Director
Friends of Animals, Western Region Office
7500 E. Arapahoe Rd., Ste. 385
Centennial, CO 80112
720-949-7791
jennifer@friendsofanimals.org