**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**FRIENDS OF ANIMALS**,

        Plaintiff,

        v.

**THE UNITED STATES BUREAU OF
LAND MANAGEMENT**,

        Defendant.

Case No. 17-cv-00136 (CRC)

---

## MEMORANDUM OPINION

The Bureau of Land Management ("BLM") is entrusted with managing the population of wild horses that roam public rangeland in the western United States. To fulfill this statutory responsibility, BLM must periodically remove horses from the range. One such removal operation—also known as a "gather"—is scheduled to begin tomorrow, February 8, 2017, in Utah's Cedar Mountains. The operation has been challenged, however, by the animal welfare organization, Friends of Animals. The organization seeks a preliminary injunction halting the gather on the grounds that BLM has not adequately considered the environmental consequences of the operation and has not properly determined that an overpopulation of horses exists. Having considered the parties' arguments and evidentiary submissions on an expedited basis, the Court finds that Friends of Animals has not demonstrated that its challenges are likely to succeed, that it would suffer irreparable harm as a result of the gather, or that the balance of the equities and the public interest weigh in its favor. The Court will, accordingly, deny Plaintiff's preliminary injunction motion.

I.      **Background**

    A.  Statutory Background

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 (2012), *et seq.*,

"requires federal agencies to consider the environmental impact of any major federal action."

Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 89 (1983).  Generally,

when such an action is contemplated, the agency must prepare an Environmental Assessment

("EA") to determine if the action's expected effects are "significant."  See 40 C.F.R. § 1501.4.  If

they are, then the proposed action calls for a more thorough Environmental Impact Statement

("EIS").  See 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11.  If the likely effects are not considered

significant, then the agency must make a Finding of No Significant Impact ("FONSI") before

carrying out the action.  See 40 C.F.R. § 1508.13.

BLM recognizes that proposed horse gathers are subject to NEPA.  See BLM, Removal

Manual, 4720.3 (2010).  However, the Bureau has also determined that sometimes a proposed

gather is so similar to a previous one that no *new* NEPA analysis is warranted.  Accordingly,

BLM has instructed its officials to "use existing environmental analyses to analyze effects

associated with a proposed action . . . when doing so would build on work that has already been

done [and would] avoid redundancy[.]"  BLM, NEPA Handbook, H-1790-1 at 21 (2008).  In

those circumstances, BLM officials are to prepare a Determination of NEPA Adequacy

("DNA"), confirming "that an action is adequately analyzed in existing NEPA document(s)[.]"

Id. at 22.  To issue a DNA, officials must complete an accompanying "worksheet" by answering

a list of questions, such as: whether "the [relevant] geographic and resource conditions are

sufficiently similar to those analyzed in the existing NEPA documents," and whether "the

existing analysis [is] valid in light of any new information or circumstances[.]"  Id. at 23.  If the

answer to even one of these questions is "no," then "a new EA or EIS must be prepared." Id.

Otherwise, no further NEPA analysis is necessary before carrying out the proposed action. But

because a DNA is "not [a] new NEPA analys[is]," the fate of any action justified by a DNA

"must rise or fall on the contents of the previously issued NEPA documents." S. Utah

Wilderness All. v. Norton, 457 F. Supp. 2d 1253, 1264 (D. Utah 2006).

Also governing the challenged removal decision is the Wild Free-Roaming Horses and

Burros Act ("Wild Horses Act"), 16 U.S.C. §§ 1331–40, which was enacted in 1971 to protect

wild horses on public lands "from capture, branding, harassment, or death." Kleppe v. New

Mexico, 426 U.S. 529, 531 (1976) (quoting 16 U.S.C. § 1331). But because wild horses are only

one ingredient in the lands' ecological makeup, Congress amended the Act in 1978 "to cut back

on the protection the Act affords wild horses, and to reemphasize other uses of the natural

resources wild horses consume." Am. Horse Prot. Ass'n v. Watt, 694 F.2d 1310, 1316 (D.C. Cir.

1982). In keeping with these twin goals, the Act directs the Secretary of the Interior to "maintain

a current inventory of wild free-roaming horses and burros" in designated herd management

areas ("HMAs"), and to define "appropriate management [population] levels" ("AMLs") for

those areas based on site-specific environmental analysis. 16 U.S.C. § 1333(b)(1); see also

BLM, Wild Horses and Burros Management Handbook, H-4700-1 at 17–18 (2010) (explaining

that the AML should be "expressed as a population range," and should be based on an "in-depth

evaluation of intensive monitoring data or land health assessment"). Furthermore, when the

Secretary determines that a herd management area is overpopulated and that corrective action is

necessary, the statute provides that "he shall immediately remove excess animals from the range

. . . so as to restore a thriving natural ecological balance to the range, and protect the range from the deterioration associated with overpopulation[.]"  16 U.S.C. § 1333(b)(2).

    B.  Factual Background

    The Cedar Mountains are nestled in Tooele County, Utah, approximately 45 miles west of Salt Lake City.  Pl.'s Mot. Prelim. Inj. ("MPI"), Ex. E ("2003 Decision and EA") at 5.[1]  Early settlers and cavalry introduced wild horses to the region as early as the late 1800s.  Id. at 17.  With few natural predators and ample vegetation, the wild horse population has flourished since then.  Unchecked, the population is capable of doubling every three years.  Id. at 5.  Pursuant to the Wild Horses Act, the Cedar Mountain Herd Management Area was established in 1971 to protect the herd of wild horses that roamed within it.  Id. at 17.  BLM's Salt Lake Field Office assumed responsibility for the long-term management of the Cedar Mountain HMA, which included setting an AML range for the herd and conducting periodic censuses and removal operations to prevent overpopulation.  Id.  The first such gather and removal took place in 1975, and gathers have occurred at fairly regular intervals since then.  Id.

    After taking an aerial census and conducting an EA in 2003, BLM expanded the HMA's boundaries and adjusted the AML from 85 to 273, with the aim of maintaining the wild horse population between 190 and 390 depending on environmental conditions.  2003 Decision and EA at 1–2, 5.  The AML was increased so that "[g]enetic defects, if present, would be diluted by a reduction in inbreeding that may occur in smaller populations."  Id. at 25.  The 2003 EA set the upper limit of the population range based on the number of horses "the area would support in a

---

[1] Throughout the opinion, the Court will cite page numbers from Plaintiff's exhibits by reference to the Bates stamp in the upper left-hand corner of the relevant page, with the preceding zeros removed.

thriving ecological balance." Id.  The lower limit, by contrast, was the number of horses "the area would support under drought conditions . . . ." Id. at 26.[2]

BLM has twice gathered and removed excess horses based on the AML range established in 2003:  In 2008, 573 wild horses were to be gathered, 447 removed, and 126 released back into the HMA.  Pl.'s MPI, Ex. D ("2008 Decision and EA") at 1.  In 2012, 326 wild horses were to be gathered, 65 removed, and 261 released.  See Pl.'s MPI, Ex. C ("2012 Decision and EA") at 2.  During the gathers, breeding age mares were treated with the contraceptive *porcine zona pellucidae* ("PZP")—which inhibits reproduction for two to three breeding seasons—prior to being released.  Id.  BLM conducted a supporting EA for both gathers and ultimately concluded that neither would cause a significant environmental impact.  See 2008 Decision and EA; 2012 Decision and EA.

In March 2016, BLM again surveyed the herd, estimating that it had grown to approximately 800 horses.  Pl.'s MPI, Ex. F ("2016 Draft DNA") at 5.  The Bureau proposed an action to remove the excess population by rounding up 600 horses from the HMA, removing 200, and releasing 400 after first treating an estimated 200 mares with PZP.  Id. at 2.  In a draft DNA, BLM found that the prior 2008 and 2012 EAs covered the proposed gather because "[they] analyze[d] the same analysis area as the proposed action [and] [t]here have been no changes to the HMA boundary, HMA AML or use of [PZP] since the preparation of the previous EAs."  Id. at 4.  BLM determined that the potential alternatives to the proposed action were the same as those presented and rejected in previous EAs.  Id. ("There are no unique circumstances, concerns, interests or resource values that would suggest a need for other action alternatives.").

---

[2] "The overriding limiting factor for the carrying capacity of the horses in the Cedar Mountains is not the available forage, but the supply of reliable water."  2003 Decision and EA at 26.

The draft DNA also specifically incorporated by reference the environmental effects identified and analyzed by the 2012 EA.  Id. at 6.

The Bureau presented the draft DNA to the public for a 30-day comment period, and received eight comments—widely ranging in their degree of support—from state and local governments, individuals, and organizations, including Plaintiff.  Pl.'s MPI, Ex. B ("2016 DNA") at 10.  Utah's Public Lands Policy Coordinating Office, for example, urged BLM to expand the removal of excess horses "to avoid degradation of public rangelands" and questioned the effectiveness of PZP as a contraceptive.  Id. at 51.  Plaintiff voiced different concerns:  It criticized BLM for failing to conduct a new analysis of environmental effects, review recent studies on PZP treatment, and consider the potential impact of the gather on golden eagles nesting in the gather area.  Id. at 58–65.  BLM responded to the comments, revising the DNA to address any potential impacts on golden eagle activity and proposing a slightly larger gather and removal of horses, as far as the budget allowed.  See id. at 51–65 (BLM's responses to the comments).  In December 2016, BLM issued the final DNA, accompanied by an appealable Decision Record, which authorized gathering 600–700 horses, removing 200–300 horses, and treating with PZP any mare above a year old in the group of 400 horses (i.e., roughly 200 horses) that would be returned to the HMA.  Pl.'s MPI, Ex. A ("2016 Decision Record") at 2.

On January 20, 2017, six weeks after BLM issued its final decision authorizing the gather, Friends of Animals filed suit against BLM.  A week later, it filed a Motion for a Preliminary Injunction to halt the gather, which is scheduled to begin on February 8, 2017.  Alternatively, Plaintiff requests that the Court delay the gather for 30 days while deciding the present motion.  The practical effect of a 30-day delay, however, would be to push back the gather by at least five months because BLM policy prohibits gathers during peak foaling season,

which spans from March to July.  The Court held a telephonic conference on January 30, 2017, in which it discussed with the parties the possibility of postponing the gather to allow for more thorough briefing and consideration of the issues.  Given the proximity to foaling season, BLM declined to postpone the operation, and the Court set an expedited briefing schedule.  Neither party has requested a hearing.

## II.   Standard of Review

A preliminary injunction is "an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008).  In order to obtain a preliminary injunction to prevent BLM from conducting its planned gather, Plaintiff must establish that it is "likely to succeed on the merits, that [it is] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  Id. at 20.  The D.C. Circuit has indicated that, even after the Supreme Court's decision in Winter, "[a] district court must balance the strength of a plaintiff's arguments in each of the four elements when deciding whether to grant a preliminary injunction."  Mills v. District of Columbia, 571 F.3d 1304, 1308 (D.C. Cir. 2009).  Nonetheless, "it is especially important for the movant to demonstrate a likelihood of success on the merits."  Nat'l Head Start Ass'n v. U.S. Dep't of Health & Human Servs., 297 F. Supp. 2d 242, 246 (D.D.C. 2004) (citing Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 360, 366 (D.C. Cir. 1999)).

### III.  Analysis

A.  <u>Likelihood of Success on the Merits</u>

Friends of Animals challenges the Bureau's 2016 Decision on three main grounds.  First, it argues that BLM's action is not grounded on a recognized NEPA document—such as an EA, FONSI, or EIS—and that it should be.  <u>See</u> Pl.'s MPI 12–18.  Relatedly, Plaintiff contends that neither the DNA, nor any of the prior NEPA documents that it incorporates, adequately accounts for recent scientific literature on the effects of PZP treatment on mares—particularly the impact of *consecutive* PZP injections.  <u>Id.</u> at 19–20.  Second, pointing to language in prior EAs indicating that future removal actions will be justified by "appropriate" NEPA documentation, Plaintiff insists that BLM has failed "to honor [those] affirmative commitments" by authorizing the impending gather without an additional EA.  <u>Id.</u> at 20–21.  Finally, in addition to the above purported NEPA violations, Plaintiff asserts a violation of the Wild Horses Act:  It argues that BLM failed to make a proper "excess" population determination before authorizing the removal, as required by the Act.

All of the above claims are governed by the Administrative Procedure Act ("APA"), under which a court may "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Under that deferential standard, an agency's decisions are reversible if the Court determines that the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  <u>Nat'l Ass'n of Home Builders v. Defs. of Wildlife</u>, 551 U.S. 644, 658 (2007) (quoting <u>Motor Vehicle Mfrs.</u>

Ass'n of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43 (1983)).

Under some circumstances, agency decisions are also reversible upon a finding of procedural

error.  See 5 U.S.C. § 706(2)(D) (permitting reversal where an agency action was taken "without

observance of procedure required by law").

     *1.  Whether Prior EAs Sufficiently Analyzed the Effects of the Planned Gather*

     NEPA's implementing regulations allow agencies to support an action with an existing

environmental analysis as long as the agency (1) "prepared [the existing analysis] pursuant to

NEPA and the Council on Environmental Quality regulations" and (2) "determines, with

appropriate supporting documentation, that [the analysis] adequately assesses the environmental

effects of the proposed action and reasonable alternatives."  43 C.F.R. § 46.120(c).  In

determining whether an existing analysis covers a proposed action, the agency must ensure that

"new circumstances, new information or changes in the action or its impacts not previously

analyzed [do not] result in *significantly* different environmental effects."  Id. (emphasis added).

The governing statute and accompanying regulations, however, do not require such a

determination to carry a NEPA-approved label.  Rather, courts have generally upheld an

agency's reliance on prior EAs when "no new information or circumstances . . . convey[] a

different picture of the affected environment."  Colorado Wild Horse v. Jewell, 130 F. Supp. 3d

205, 218 (D.D.C. 2015) (quoting S. Utah Wilderness All., 457 F. Supp. 2d at 1261–62) (internal

quotation marks omitted); see also Friends of Animals v. BLM, 2015 WL 803169, at *4 (D. Utah

Feb. 26, 2015).

     The gather proposed here, along with its supporting "Determination of NEPA

Adequacy," likely checks these boxes.  BLM's DNA concluded that the proposed gather was

"essentially similar to" previous ones because the capture method is the same and "there have

been no changes to the HMA boundary, HMA AML or use of PZP-22 since the preparation of

the previous EAs." 2016 DNA at 3–4. It further confirmed that the range of alternatives

analyzed in the previous EAs remained appropriate because "no unique circumstances, concerns,

interests, or resource values . . . suggest a need for other action alternatives." Id. at 4. And

finally, the Bureau considered new information related to health standards, endangered species,

and other potentially affected animals, and found nothing substantially changed the analysis of

the proposed action. Id. In fact, "the changes that have occurred since [the 2008 and 2012

gathers]—including the continued increase in the wild horse population, the accompanying

increases in demand on rangeland resources, etc.—were both anticipated and discussed in the

[previous] EAs." Friends of Animals, 2015 WL 803169, at *4.

Plaintiff argues that BLM's reliance on the prior EAs was arbitrary and capricious

because the proposed gather is larger than the past ones. This argument falters for two reasons.

First, BLM currently recommends gathering between 600 and 700 horses, removing 200 to 300,

and releasing 400 back into the HMA. In 2008, by comparison, BLM planned to capture 573

horses, remove 447, and release 126. While the action proposed here would gather 25 to 125

more horses than in 2008, the number of horses that would be permanently removed is at least

150 *less* than in 2008. The overall number of horses involved in the proposed action is therefore

generally consistent with the 2008 gather. Cf. Friends of Animals v. BLM, 2015 WL 555980, at

*3 (D. Nev. Feb. 11, 2015) (finding BLM inappropriately relied on a past EA when the proposed

gather would both capture 130 more horses and remove 150 more horses than the previous one).

Second, while the Court agrees with Plaintiff that widely expansive agency actions should not be

supported by narrow EAs, it hesitates to second-guess BLM's reasoned judgment that gathering

25 or 125 more horses—using the same capture and PZP treatment methods, from the same area,

and with the same AML target range as in previous gathers—would not result in "significantly different environmental effects." 43 C.F.R. § 46.120. "The NEPA process involves an almost endless series of judgment calls [and] [t]he line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts." Coal. On Sensible Transp. v. Dole, 826 F.2d 60, 66 (D.C. Cir. 1987).

Plaintiff also argues that BLM was arbitrary and capricious in failing to adequately address new information, in the form of several recent studies on the effects of PZP treatment on horses. Agencies, however, are not required to supplement their analysis by addressing every study brought to their attention, only those that show the proposed action would "affec[t] the quality of the human environment in a significant manner or to a significant extent not already considered . . . ." Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 374 (1989) (citing 42 U.S.C. § 4332(2)(C)) (internal quotation marks omitted). And where "analysis of the relevant documents requires a high level of technical expertise, [courts] must defer to the informed discretion of the responsible federal agencies." Id. at 377 (internal quotations marks and citation omitted).

BLM considered the studies offered by Plaintiff in its comments and determined that they did not significantly change BLM's prior analysis. The Bureau found studies on *consecutive* years of PZP treatment, for example, irrelevant to the proposed action because Cedar Mountain mares are treated in four- to five-year intervals, not in consecutive years or breeding cycles.[3] See Def.'s Opp'n Pl.'s MPI ("Opp'n") 18. In addition, Plaintiff presented a 2014 study which concluded that PZP-treated mares are more likely to change bands. BLM considered similar

---

[3] At a maximum, 59 mares could be treated with PZP three times over a nine-year period. No mare has ever been treated in consecutive years. See 2016 DNA at 5.

findings—from an older study by the same author—in its 2012 EA.  2012 Decision and EA at

39.  Citing that study, BLM acknowledged that the long-term effects of PZP treatment were

unknown, but concluded that PZP treatment was still the best alternative.  Id.  And in its 2016

DNA, BLM drew on a 2013 National Research Council report that found that "harem changing

was not likely to result in serious adverse effects for treated mares[.]"  2016 DNA at 6.  The

information within the 2014 study offered by Plaintiff, therefore, was neither new nor contrary to

BLM's analysis.  The 2013 National Research Council report, cited by BLM in its DNA, also

evaluated studies on how PZP treatment affected mares' birthing cycles and out-of-season births,

but indicated that the impact might not be statistically significant.  Given these reasoned

determinations, the Court concludes that BLM most likely acted within its informed discretion in

refusing to find that the "new information" offered by Plaintiff warranted additional

environmental analysis.

### 2.  Whether BLM Violated "Affirmative Commitments" Stated in Prior EAs

As a final alleged instance of NEPA noncompliance, Plaintiff argues that BLM violated

certain "binding commitments [the Bureau] made to the public in its [previous] decision records"

by failing to conduct an EA for the impending gather.  Pl.'s MPI 21.  Plaintiff identifies two

examples of these supposedly unkept promises.  First, in a paragraph of its 2003 EA discussing

the potential long-term impact of gathers on "[n]eotropical birds and other wildlife species,"

BLM noted that "[s]ite-specific analysis for future actions would be addressed in NEPA

documents specific to the actions to be taken."  2003 Decision and EA at 31.  Second, in its 2012

FONSI, the Bureau stated:

> The action is compatible with future consideration of actions required to improve
> wild horse management in conjunction with meeting objectives for wildlife habitat
> within the herd management areas.  The selected alternative does not set a precedent

for future actions.  Future actions would be subject to evaluation through the appropriate level of NEPA documentation.

2012 Decision and EA at 10.  Plaintiff argues that these "commitments" were issued "in accordance with the agency's own directives to prepare site-specific NEPA analysis for each roundup."  Pl.'s MPI 21 (citing BLM Manual 4720.2.21).  In short, Plaintiff's argument rests on the premise that BLM has committed itself—either in past decisions or in Bureau guidance—to issuing an EA, or some other document formally identified in NEPA regulations, for every individual gather.

Plaintiff reads too much into BLM's guidance and prior statements.  The Bureau's guidance—far from indicating that an EA or other formally recognized NEPA document should be created for every gather—actually encourages its officials to "use existing environmental analyses to analyze effects associated with a proposed action" in order to "avoid redundancy." BLM, NEPA Handbook, H-1790-1 at 21.  That is why BLM has given its officials the option of completing a DNA when "an action is adequately analyzed in existing NEPA document(s)[.]" Id. at 22.  And there is no special exception for wild horse removals:  The Bureau's manual on removals cited by Plaintiff cross-references the BLM NEPA Handbook, which among other things, details the Bureau's DNA protocol.  See BLM Manual 4720.3 (citing BLM Handbook H-1790-1).  In that context, it is clear that BLM's past statements—that some "appropriate level" of NEPA analysis would be conducted for future actions—refer not only to formal NEPA documentation, but also to DNAs ("determinations of *NEPA* adequacy").  By completing a DNA for the proposed gather, then, it appears that BLM has acted consistently with its past pronouncements and with its own policy.  It appears not to have "violated" any affirmative commitments.

3.   *Whether BLM Failed to Make a Proper "Excess" Population Determination*

In addition to alleging that BLM violated NEPA, Plaintiff contends that the Bureau

violated the Wild Horses Act by failing to make an "excess" population determination, as

required by the statute.  See Pl.'s MPI 22–23; 16 U.S.C. § 1333(b)(2) (directing the Secretary of

the Interior to "immediately remove *excess* animals from the range . . . so as to restore a thriving

natural ecological balance to the range, and protect the range from the deterioration associated

with overpopulation[.]" (emphasis added)).  Plaintiff also asserts that, even if there was an excess

determination, BLM did not "properly account[] for current range conditions," "current herd

size," and "the wild horse population's role in maintaining a thriving ecological balance therein."

Pl.'s MPI 23.

But these assertions cannot be squared with the record.  In rendering its final decision,

BLM clearly explained that the planned "gather is necessary to remove *excess* wild horses and to

reduce the population in order to achieve and maintain a thriving natural ecological balance

between wild horses and other multiple uses as required under [the Wild Horses Act.]"  2016

Decision Record at 4 (emphasis added).  Furthermore, the decision's accompanying DNA makes

plain that the excess population determination was based on an assessment of current herd size

and relevant ecological conditions.  BLM's excess determination was made by reference to the

AML for the Cedar Mountain herd management area.  See 2016 DNA at 4–5.  That AML was

established in 2003 at between 190 and 390 horses, see 2003 Decision and EA, after a thorough

EA that assessed the impact of the herd size on the area's soils, vegetation, wildlife, and cultural

and historical resources, among other topics.  See generally 2003 Decision and EA.[4]  BLM

_____

[4] In its Reply, Plaintiff faults BLM for failing to comply with certain language in the
Wild Horses Act, see 16 U.S.C. § 1333(a) (requiring consultations with independent scientific
professionals), and in a Bureau handbook, see Wild Horses and Burros Management Handbook,

compared the AML to the herd's actual population, which was calculated to be 800 horses strong in March 2016 based on an aerial survey, and was estimated to have risen (based on a predicted 20% increase due to 2016 foal births) to approximately 960 horses by the time of the final decision in December 2016.  See 2016 DNA at 5–6.  Clearly, if the high end of a population's sustainable range is 390, and there are over 900 horses in the current population, then there is an "excess" population, which the Secretary must correct.  In other words, contrary to Plaintiff's assertions, not only did BLM make an "excess" determination, but the logic underpinning that determination appears simple and sound.

Separately, Plaintiff argues that "BLM intends to apply PZP to wild horses that are not considered 'excess,'" and that "absent an 'excess determination' BLM does not have authority to target these wild horses."  Pl.'s MPI 23.  This argument is a nonstarter, for at least two reasons. First, the roughly 200 mares who will be subject to PZP treatment are indeed "excess" according to the above math (even after 200–300 horses are permanently removed).  Second, Plaintiff has not established that BLM must make an excess determination before treating horses with PZP. The one case it cites on the matter, Colorado Wild Horse & Burro Coal., Inc. v. Salazar, 639 F. Supp. 2d 87 (D.D.C. 2009), addresses excess determinations only in the context of *removal*, not other forms of population management.  See id. at 95–96.  For these reasons, BLM's decision to

_____

H-4700-1 at 19 (2010) (requiring an analysis of various ecological information such as climate data and "range conditions" in making an excess population determination).  See Pl.'s Reply Supp. MPI ("Reply") 8–9.  But Plaintiff does not contest that BLM engaged in this analysis in its prior EAs.  Accordingly, to the extent these arguments are not waived as a result of being raised initially in Plaintiff's Reply, they dovetail with Plaintiff's challenges to the adequacy of BLM's prior NEPA analysis, which are addressed above.

administer PZP to roughly 200 horses does not appear to be out of step with any statutory or

regulatory requirements.

To summarize, it is likely that BLM properly determined that there were excess horses in

the Cedar Mountain HMA, and its decision to remove or otherwise manage that excess

population does not appear to be in violation of the Wild Horses Act.

*      *      *

For the foregoing reasons, it is unlikely that Plaintiff will succeed on the merits of its

claim.  The Court will now turn to the remaining preliminary injunction requirements.

B.  Irreparable Harm

An injunction is appropriate only if the applicant has demonstrated irreparable harm—

that is, the inadequacy of legal remedies.  Sierra Club v. U.S. Army Corps of Eng'rs, 990 F.

Supp. 2d 9, 38 (D.D.C. 2013).  "The party seeking injunctive relief must demonstrate that the

claimed injury is 'both certain and great.'"  Id. at 38–39 (quoting Wis. Gas Co. v. Fed. Energy

Reg. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The moving party must also "show that

'[t]he injury complained of [is] of such imminence that there is a 'clear and present' need for

equitable relief to prevent irreparable harm.'"  Wis. Gas Co., 758 F.2d at 674 (quoting Ashland

Oil, Inc. v. FTC, 409 F. Supp. 297, 307 (D.D.C. 1976)).  And a plaintiff must present the Court

with enough evidence to "substantiat[e]" their claim of irreparable injury.  Wis. Gas Co., 758

F.2d at 674.

Plaintiff identifies four ways in which it might suffer irreparable harm in the absence of a

preliminary injunction.  First, Plaintiff maintains that "the permanent loss of 200–300 herd

members from the HMA will cause [it] irreparable aesthetic injury due to its members' personal

and professional interests in observing, studying, and photographing the horses of the Cedar

Mountain herd." Pl.'s MPI 28.  In support, Plaintiff attaches a declaration from one of its

members, who has "photograph[ed] the Cedar Mountain horses extensively over the past years[,]

. . . prid[ing] himself on his ability to observe wild horses at close range." Id. at 29; see

generally Pl.'s MPI, Steele Decl.

As discussed above, however, BLM proposes to remove no more than 300 horses from an

estimated herd population of *over 900*.  See Def.'s Opp'n, Ex. 3 ("Warr Decl.") ¶ 19 ("It is

estimated that several hundred horses will remain on the HMA at the completion of the gather

[plus those that are to be returned.]").  Even after a removal of that size, the remaining

population would be larger than that existing *prior* to the 2012 removal.  See 2016 DNA at 6.

Accordingly, as this Court has previously found under similar circumstances, "a sufficient

number of horses would likely remain in [the] area . . . to satisfy Plaintiff['s] interest in

observing and enjoying the wild-horse population[.]" Colorado Wild Horse, 130 F. Supp. 3d at

219; see also Am. Horse Prot. Ass'n, Inc. v. Frizzell, 403 F. Supp. 1206, 1219 (D. Nev. 1975)

(noting that plaintiffs' interest in having wild horses available for observation would "not be

affected adversely in any significant way" if BLM removed 400 of between 1,000 and 1,200

wild horses).  Furthermore, given an estimated annual growth rate of 20%, the population will

have returned to its current, pre-removal level within a few years.  See 2016 DNA at 6.  Finally,

as BLM stresses, the whole "reason for the gather is to ensure the long[-]term sustainability of

the horses, thereby ensuring [the] ability to photograph [and view] them for years to come."

Def.'s Opp'n 22.

Plaintiff cites a number of cases for the proposition that a mere decrease in an animal

population is sufficient to constitute irreparable harm under the preliminary injunction analysis.

See Pl.'s MPI 24–25.  As BLM notes, however, those cases mostly address Article III *standing*,

not the irreparable harm requirement.  See Def.'s Opp'n 22.  Plaintiff characterizes this

distinction as a "red herring," seeing no reason "why an injury that is sufficient to confer

standing should be treated as insufficient to carry a burden of irreparable harm."  Pl.'s Reply

Supp. MPI ("Reply") 11.  But there is a wide and apparent gap between the two standards.

Article III standing may be present for even slight (and reparable) injuries.  See, e.g., Whitmore

v. Arkansas, 495 U.S. 149, 155 (1990) (describing Article III's "injury in fact" component as

requiring only "concrete," "distinct," and "actual" harm).  Irreparable harm, by contrast, must be

both "certain and great."  Wis. Gas Co., 758 F.2d at 674.[5]

    As a second source of irreparable harm, Plaintiff claims that, because its members have

"intimate connection[s]" with the horses, "[t]he witnessing, or even the contemplation, of this

inhumane treatment of the wild horses will inflict aesthetic and emotional injury upon Plaintiff

and its members[.]"  Pl.'s MPI 28.  Although the Court does not question the sincerity or depth

of the emotional connection that Plaintiff's members feel with the Cedar Mountain horses,

Plaintiff's "reliance on emotional distress as a form of irreparable injury is misplaced" under

these circumstances.  Colorado Wild Horse, 130 F. Supp. 3d at 220.  Such vicarious emotional

---

[5] Plaintiff does cite a few cases finding irreparable harm from a diminished—but not eradicated—protected animal population.  See Pl.'s MPI 24–25; Pl.'s Reply 12–13 (citing Funds for Animals v. Norton, 281 F. Supp. 2d 209 (D.D.C. 2003); Fund for Animals v. Clark, 27 F. Supp. 2d 8 (D.D.C. 1998); and Sierra Club v. Martin, 933 F. Supp. 1559 (N.D. Ga. 1996), rev'd on other grounds 110 F.3d 1551 (11th Cir. 1997)).  But two of those cases primarily grounded their finding of irreparable harm on the emotional distress that the plaintiffs would experience in witnessing or contemplating the killing or severe injuring of the affected animals—not on the mere disruption of their viewing and observation opportunities.  See Norton, 281 F. Supp. 2d at 219–22; Clark, 27 F. Supp. 2d at 14.  As discussed further below, there is no similar intent to eradicate or seriously harm animals here.  The third cited case is also distinguishable, because it also involved the killing of animals in large numbers, and because its decision was grounded in the text of the Migratory Bird Treaty Act, which "proscribes any killing of any migratory bird."  Martin, 933 F. Supp. at 1571.

distress might qualify as irreparable harm where the challenged defendant is taking action that could kill (or seriously injure) significant numbers of animals. See Fund for Animals v. Norton, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (describing the harm that plaintiffs would experience from contemplating the killing of 525 mute swans); Fund for Animals v. Clark, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) (describing the harm that plaintiffs would experience from "seeing or contemplating . . . bison being killed in an organized hunt"). Here, though, BLM does not intend to eradicate any healthy animals. Moreover, the history of past gathers suggests that the risk of serious physical harm to the wild horses is quite low.[6] Therefore, Plaintiff's observation or contemplation of the possible—though unlikely—physical harm that the horses may suffer does not rise to the level of a "certain and great" irreparable injury. Wis. Gas Co., 758 F.2d at 674

Plaintiff offers two other potentially irreparable harms that may be addressed briefly. It suggests that the PZP treatments "may injure the health of the horses or alter their behavior, [thus] impairing [P]laintiff's ability to study and observe the wild horses." Pl.'s MPI 29–30. But as discussed above, the claim that PZP as used here has long-term, adverse effects on the health of horses is unsubstantiated by scientific literature, and Plaintiff points only to the declaration of its photographer-member to support it. Finally, Plaintiff suggests that BLM's alleged procedural violation of NEPA is an irreparable harm, id. at 30–32, or at least "bolster[s]" its claims of aesthetic and emotional harm, Pl.'s Reply 15. But a "procedural harm arising from a NEPA violation is insufficient, standing alone, to constitute irreparable harm justifying issuance of a

---

[6] See Colorado Wild Horse, 130 F. Supp. 3d at 220 (citing hearing testimony from BLM to the effect that horse gather mortality rates are typically "about 1 percent and less"); Final Status Report, Colorado Wild Horse v. Jewell, No. 15-cv-1454, Sept. 25, 2015, ECF No. 34 (reporting two deaths resulting from a 167-horse gather). Notwithstanding this prior history, the Court will, consistent with past practice, order BLM to file daily status reports summarizing the results of the gather, including any deaths or serious injuries to the horses.

preliminary injunction." Norton, 281 F. Supp. 2d at 222.  And as discussed in the above merits

analysis, the Court finds it unlikely that Plaintiff has indeed identified any actual NEPA

violations.  For that reason alone, the procedural harm Plaintiff alleges does not make irreparable

injury any more likely.

    No matter the ultimate result of this proceeding, Plaintiff and its members will likely

continue to enjoy ample ability to view and photograph wild horses in the Cedar Mountain

HMA.  For that reason and the others described above, the Court concludes that Plaintiff has not

met its burden to demonstrate a likelihood of irreparable injury.[7]

    C.   Balance of Equities and the Public Interest

    A party seeking a preliminary injunction must demonstrate both "that the balance of

equities tips in [its] favor, and that an injunction is in the public interest."  Winter, 555 U.S. at

20.  "These factors merge when the Government is the opposing party."  Nken v. Holder, 556

U.S. 418, 435 (2009).

    Plaintiff contends that it will suffer irreparable injury as described above, that the public

has a general interest in compliance with the law by public officials, and that any harm to BLM

---

[7] Defendants also argue that Plaintiff's delay in bringing their motion undermines its claim that emergency relief is necessary.  Def.'s Opp'n 10–12.  The Court is indeed troubled by the delay, which appears to follow a pattern of eleventh-hour injunction requests in connection with long-planned wild-horse gathers, see, e.g., Colorado Wild Horse, 130 F. Supp. 3d at 218 n.8 (42-day delay in moving for emergency relief); Habitat for Horses v. Salazar, 745 F. Supp. 2d 438, 449 (S.D.N.Y. 2010) (30-day delay in bringing suit).  As discussed above, the proposed gather was published on BLM's website in June 2016; was followed by a public comment period (in which Plaintiff participated) in September and October; and was finalized as a decision on December 9, 2016.  Plaintiff brought this action on January 20, 2017, and moved for an injunction on January 27, a full *seven weeks* after the final gather decision was issued (and less than two weeks before the gather's scheduled commencement).  Nevertheless, because the Court concludes that Plaintiff has not otherwise established irreparable harm, it need not decide the extent to which Plaintiff's delay in moving for an injunction weakens their claimed necessity for emergency relief.

from a delay will be minimal to nonexistent.  See Pl's. MPI 32–34.  In Plaintiff's view, delaying

the gather would be a mere "minor annoyance" to the Bureau.  Id. at 33.  Plaintiff also suggests

that it would be of no consequence to the horses or the range ecosystem to postpone the gather,

seeing as there has not been a removal in the Cedar Mountain HMA for five years.  Id.

These arguments significantly understate the harms that BLM has identified, both to the

public and the Bureau itself, should the Court postpone the gather.  BLM has offered evidence

that if the Cedar Mountain horse population is not soon checked, "[it] will grow and consume

natural resources, leading to further deterioration of the range."  Defs.' Opp'n 25 (citing Warr

Decl. ¶ 24).  The Bureau has a policy of prohibiting helicopter gathers during the horse "foaling

period," which runs from March 1 to June 30, meaning that if the February gather is even

minimally delayed, the *soonest* it can occur is in July of this year.  Warr Decl. ¶ 17.[8]  By then "an

additional 150–200 horses would be on the range," nearly the same number of horses that BLM

intends to permanently remove during the planned gather.  Id.  According to an expert

declaration submitted by BLM, that increased population would place ecological stress on the

range.  Id. ¶¶ 8–9, 17; see also Blake v. Babbitt, 837 F. Supp. 458, 459 (D.D.C. 1993) ("[T]he

endangered and rapidly deteriorating range cannot wait.").  Perhaps even more to the point, it

would negatively impact the health of the horses *themselves*, particularly due to the scarcity of

water resources during the summer months.  Warr Decl. ¶ 9 (describing the negative effects of

water shortages on the body condition of wild horses).

Harm to the horses would, in turn, likely mean harm to BLM.  Every summer since 2000,

the Bureau has devoted considerable resources to "water hauling" in the Cedar Mountain range.

---

[8] In the event of a postponement, BLM indicates that the rescheduled date for the gather
would likely be even later than July 2017, since "BLM has other gathers planned for summer and
fall of 2017, [such that] its resources are already committed."  Warr Decl. ¶ 22.

Id.  For instance, last summer, the Bureau lugged 81,000 gallons of water into the area.  Id.  With a swelling horse population—hundreds larger than last year's—BLM's water hauling expenditures this summer would also increase without the benefit of a gather.  And that would not be the only source of financial harm to BLM if the gather were blocked.  The Bureau explains that a "significant amount of time has already been expended with BLM contracting staff to solicit [bids from horse gather contractors], defin[e] gather parameters . . . and [award contracts]" for the gather.  Id. ¶ 21.  All told, gather preparation entails "months of planning and coordination involving dozens of personnel inside and outside of BLM."  Id.  To the extent such time and funds could not be applied to a subsequent gather, those resources would be lost.

Plaintiff does not usher any evidence undermining the factual validity of these claims.  Rather, it opines that the cost of water hauling may not "outweigh the costs associated with feeding and caring for [the removed] horses when they are held in captivity," and that "the reduced [horse] population [may not] appreciably reduce the cost of this [water] haul at all."  Pl.'s Reply 18.  Again without citing evidence, Plaintiff also asserts that, because "[u]nweaned foals depend on their mothers for nutrition," the added foal population "will not increase the herd's burden on the range's resources."  Id. at 19.  While these assertions could prove to be accurate, such "unsubstantiated and speculative allegations" cannot satisfy Plaintiff's evidentiary burden in moving for an injunction.  Wis. Gas Co., 758 F.2d at 674.

Finally, Plaintiff contends that its irreparable injury and the public's interest in having public officials comply with the law tip the scales in its favor.  See Pl.'s MPI 32.  As the Court has already observed, however, any legally cognizable injury that Plaintiff would suffer as a result of the planned gather would be minimal.  And the Court has also found that Plaintiff is unlikely to demonstrate that BLM has violated either the Wild Horses Act or NEPA, meaning

that a preliminary injunction would likely have no effect on public officials' compliance with the law.  As a result, the equities on Plaintiff's side appear slight, especially when compared with the public's interest in allowing BLM to carry out its mandate of "manag[ing] wild free-roaming horses" so as to "achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1333.

In short, because BLM has established that delaying the gather would have considerable financial and logistical repercussions, and would risk damaging not only the range ecosystem but the very horse population that Plaintiff seeks to protect, the Court finds that the balance of equities and the public interest favor BLM.

## IV.   Conclusion

For the foregoing reasons, the Court concludes that Plaintiff has not met its burden to establish each of the factors required to obtain a preliminary injunction of BLM's planned gather.  The Court will therefore deny Plaintiff's Motion for a Preliminary Injunction.  An appropriate Order accompanies this Memorandum Opinion.


*Christopher R. Cooper*
CHRISTOPHER R. COOPER
United States District Judge


Date:   February 7, 2017